16-2014-CA-001354-XXXX-MA

Filing # 10610468 Electronically Filed 02/24/2014 02:27:11 PM

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA

Metro Lofts, Ltd.,

        Plaintiff,

CASE NO.:
DIVISION:

v.

Lincoln Property Company,

        Defendant.

_____/

## COMPLAINT

Plaintiff sues Defendant, alleging as follows:

### JURISDICTIONAL ALLEGATIONS

1. This is an action for trespass to personal property with amounts in controversy that exceed $15,000 exclusive of interest, costs, and attorney's fees.

2. The Court has *in personam* jurisdiction over Defendant because it is a foreign corporation authorized to do business in Florida.

3. Venue is appropriate in this Court because the cause of action accrued in Duval County, and Defendant has a place of business in Duval County.

4. Defendant may be served through its registered agent, CT Corporation System, at 1200 South Pine Island Road, Plantation, Florida 33324.

### GENERAL ALLEGATIONS

5. Defendant used to be Plaintiff's property manager at The Metropolitan loft apartments in Jacksonville, Florida.

6. In approximately August 2013, Plaintiff and Defendant ended their contractual relationship under which Defendant managed the Metropolitan.

7. During this time, Defendant destroyed all emails, files, and software on Plaintiff's computers located at The Metropolitan.

8. Defendant also took or destroyed paper records of prospective tenants and paper accounting records.

9. The records Defendant took or destroyed contained valuable business information and customer leads that cannot be recovered or replaced.

10. The emails, electronic records, and software Defendant destroyed belonged to Plaintiff and were stored on computers located on Plaintiff's property that belonged to Plaintiff.

11. The paper records Defendant took or destroyed belonged to Plaintiff and were stored on Plaintiff's property.

12. Plaintiff has spent significant sums trying to recover the electronic records and replacing the destroyed software.

13. Plaintiff has spent and continues to spend significant sums attempting to recreate some of the records Defendant took or destroyed.

14. Plaintiff has suffered and will continue to suffer lost profits and incur increased business expenses due to the loss of the records Defendant took or destroyed.

15. Defendant's destruction or taking of Plaintiff's records resulted from Defendant's gross negligence or intentional misconduct.

16. Plaintiff has retained the undersigned attorney and is obligated to pay him a reasonable fee for his services.

17. All conditions precedent to this action have been performed, waived, or have occurred.

COUNT 1 – BREACH OF CONTRACT

18. Plaintiff incorporates and re-alleges the allegations of ¶¶ 1-17 as if fully set forth herein.

19. MJL, Ltd. and Defendant were parties to a contract, an unsigned copy of which is attached hereto.

20. Plaintiff is MJL, Ltd.'s assignee.

21. Under the contract, all documents and records relating to or arising from Defendant's operation or management of The Metropolitan loft apartments were Plaintiff's property.

22. Defendant breached the contract when it took or destroyed records and documents that belonged to Plaintiff.

23. The contract provides for the prevailing party in any litigation arising under it to recover its attorney's fees.

WHEREFORE Plaintiff prays for judgment against Defendant for damages, costs, and attorney's fees.

COUNT 2 – TRESPASS TO PERSONAL PROPERTY

24. Plaintiff incorporates and re-alleges the allegations of ¶¶ 1-17 as if fully set forth herein.

25. Defendant committed a trespass against Plaintiff's personal property when it destroyed Plaintiff's electronic records and software and took or destroyed Plaintiff's paper records.

WHEREFORE Plaintiff prays for judgment against Defendant for damages, costs, and attorney's fees.

3

JEB T. BRANHAM, P.A.

Jeb T. Branham, Esq.
Fla. Bar No. 0296030
3500 3rd Street South
Jacksonville Beach, Florida  32250
Telephone:  (904) 339-0500
Facsimile:  (904) 339-0501
jeb@jebbranham.com
denise@jebbranham.com

ATTORNEY FOR PLAINTIFF

4

# APARTMENT MANAGEMENT AGREEMENT

THIS APARTMENT MANAGEMENT AGREEMENT (this "Agreement") is made as of (although not necessarily on) the 11th day of July 2011, between MJL, Ltd., a Florida Limited Partnership ("Owner") and LINCOLN APARTMENT MANAGEMENT LIMITED PARTNERSHIP, a Delaware limited partnership ("Manager").

## ARTICLE I

### Establishment of Agency and Rental Responsibility

1.1     Exclusive Agency:  Owner hereby appoints Manager and Manager hereby accepts appointment on the terms and conditions set forth herein as the sole and exclusive renting and management operating agent of the apartment project(s) non-exclusive renting and management operating agent of the office project known as **The Metropolitan** (such project(s), whether one or more, are referred to herein collectively as the "Project").  Owner warrants and represents to Manager that Owner owns fee simple title to the Project with all requisite authority to hereby appoint Manager and enter into this Agreement.

1.2     Owner's Representative:  Owner shall designate one person to serve as Owner's Representative ("Owner's Representative") in all dealings with Manager hereunder.  Whenever the approval, consent or other action of Owner is called for hereunder, such approval, consent or action shall be binding on Owner if specified in writing and signed by Owner's Representative.  The initial Owner's Representative shall be Luke Leonaitis.  The Owner's Representative may be changed at the discretion of Owner, at any time, and shall be effective upon Manager's receipt of written notice identifying the new Owner's Representative.

1.3     Leasing of Premises:  Manager shall perform promotional, leasing and management activities required to lease office and apartment units in the Project as

The Metropolitan Lofts                    July 2011                                        **1**

directed by owner.  Throughout the term of this Agreement, Manager shall use its diligent efforts to lease office and apartment units in the Project.   Subject to reimbursement by Owner, Manager shall advertise the Project, or portions thereof, prepare and secure advertising signs, space plans, circular matter, marketing brochures and other forms of advertising.  Owner shall authorize manager pursuant to Paragraph 2.2, to advertise the Project in conjunction with institutional advertising campaigns and allocate cost on a prorata basis among the projects being advertised (to the extent authorized by the Annual Business Plan defined below).  All inquiries for any leases or renewals or agreements for the rental of the Project or portions thereof shall be referred to Manager and all negotiations connected therewith shall be conducted solely by or under the direction of Manager.  Manager is hereby authorized to execute, deliver and renew apartment tenant leases on behalf of Owner. Renewal of Commercial tenant leases shall be the responsibility of Owner although Manager shall assist as requested by Owner..  Manager is authorized to utilize the services of apartment locator services and the fees of such services (including the fees of Lincoln Lifestyle referred to below) shall be operating expenses of the Project and, to the extent paid by Manager, reimbursable by Owner.

1.4   Manager's Standard of Care:  In performing Manager's duties under this Agreement, or otherwise discharging the agency established by this Agreement, Manager shall exercise the same degree of care, prudence, and skill that Manager exercises in the management of Manager's own properties.  Manager will not be liable to Owner for any act or omission that is undertaken in good faith and with the same degree of care, prudence, and skill as Manager exercises in the management of its own properties, even though Manager's conduct in a particular instance may not comport with, or otherwise may differ from, prevailing or generally accepted industry practices. Manager in no event will be liable to Owner for any consequential loss or damage,

unless caused by Manager's gross negligence or willful misconduct; consistent with the indemnity agreement in Paragraph 2.7 of this Agreement.

1.5    Owner's Representations:  Owner assumes all liability as to the quality and construction of the Property.  Owner further represents and warrants that as of the date of the execution of this Agreement the Property is in compliance with all applicable Federal, State and local laws, rules, regulations, guidelines and ordinances, including but not limited to, the Americans with Disabilities Act, the Federal Fair Housing Act, the Federal 1990 Clean Air Act, all other State and local accessibility requirements and the Applicable Building Code affecting the Property.  Further Owner agrees to defend and indemnify Manager against, and hold it harmless from, all damages, claims, loss, cost or expense arising out of the breach of the foregoing representations and warranties and from any violation, breach or failure to comply with any environmental or hazardous materials laws, including those environmental matters enumerated in Article VI of this agreement; rules, regulations and/or ordinances regarding the Property.  Owner shall further protect and indemnify Manager against, and hold it harmless from, all damages, claims, loss, cost or expenses arising out of actual or alleged defects, whether latent or patent, including but not limited to, water damage, Indoor Air Quality Issues, Mold growth, Structural Defects, and Second Hand Smoke of the Property, or for any breach or alleged breach of any legal duty or obligation which is by law or under this Agreement the responsibility of Owner.  Manager in no event will be liable to Owner for any consequential loss or damage, unless caused by Manager's gross negligence or willful misconduct consistent with the indemnity agreement in Paragraph 2.7 of this Agreement.

1.6    Mutual Agreement Not to Solicit or Hire Employees: Owner and Manager agree during the term of this Agreement and during the terms of all other property management agreements between Owner and/or its affiliated entities and Manager and/or its affiliated entities after the termination of this Agreement and all such other

agreements referred to in this section: (1) Owner shall not solicit or hire or assist in any way in soliciting or hiring, for or on behalf of themselves any existing employee of Manager, which Manager places on the Project; (2) Manager shall not solicit or hire or assist in any way in soliciting or hiring, for or on behalf of themselves either any existing employees of Owner or any new employees hired by Manager during the term of this agreement specifically for the Project.

ARTICLE II

Services to be Performed by Manager

2.1   Expense of Owner:  All acts performed by Manager in the performance of its obligations under this Agreement shall be performed as the agent of Owner, and all obligations or expenses incurred thereby, shall be for the account of, on behalf of, and at the expense of Owner, except as otherwise specifically provided in this Article II and except that Owner shall not be obligated to reimburse Manager for any expense (ii) allocable to time spent on projects other than the Project, or (iii) any personnel other than personnel located at the Project site and personnel spending a portion of their working hours (to be charged on a prorata basis) at the Project site or in specifically performing Manager's obligations hereunder, whether on or off the Project site. Manager may use employees normally assigned to other work centers or part-time employees to properly staff the Project, reduced, increased or emergency work load and the like including the property manager, business manager, assistant managers, leasing directors, or other administrative personnel, maintenance employees or maintenance supervisors whose wages and related expenses shall be reimbursed on a prorata basis for the time actually spent at or for the Project.  A property manager or business manager at the Project and any other persons performing functions substantially similar to those of a business manager, including but not limited to assistant managers, leasing directors, leasing agents, sales directors, sales agents, bookkeepers, and other administrative and/or maintenance personnel performing work

on behalf of the property, and on-site maintenance personnel, shall not be considered executive employees of Manager.   Owner acknowledges that the following miscellaneous expenses, when incurred in respect to the performance of Manager's obligations under this Agreement, shall be reimbursable by Owner (which list of expenses is not intended to be all-inclusive):  courier services, postage, photocopies, signage, check printing, marketing expenses, bank charges (including late charges on debt or other payments), telephone and answering service (which may be allocated on a prorata basis among the Project and other projects managed by Manager).  All reimbursable payments made by Manager hereunder shall be reimbursed from funds deposited in an account established pursuant to Section 4.2 of this Agreement. Manager shall not be obligated to make any advance to or for the account of Owner or to pay any sums, except out of funds held in an account maintained under Section 4.2, nor shall Manager be obligated to incur any liability or obligation for the account of Owner without assurance that the necessary funds for the discharge thereof will be provided by Owner.  In the event that the amount of gross revenues collected from the Property is insufficient to pay the Property's mortgage, or in the event that Manager reasonably expects a cash shortfall to occur, then Owner shall deposit into the Operating Account, within ten (10) business days after written request from Manager describing the items for which payment is due or for which a shortfall is projected, the amount necessary to cover the insufficiency.  In the performance of its duties as agent and Manager of the Project, Manager shall act solely as the agent of the Owner.  All debts and liabilities to third persons incurred by Manager in the course of its operation and management of the Project shall be the debts and liabilities of the Owner only, and Manager shall not be liable for any such debt or liabilities, except to the extent Manager has exceeded its authority hereunder.

2.2   Covenants Concerning Payment of Operating Expenses:   Owner covenants to pay all sums for operating expenses in excess of gross receipts required

to operate the Project upon written notice and demand from Manager within ten (10) days after receipt of written notice. Owner further recognizes that the Project may be operated in conjunction with other properties, and costs may be allocated or shared between such other properties on a more efficient or less expensive basis. In such regard, Owner consents to the allocation of costs and/or the sharing of any expenses in an effort to save cost or operate the Project in a more efficient manner so long as such allocation is done on an equitable basis and so long as the computations of such allocations are provided to Owner pursuant to Section 2.12 hereof.

2.3 <u>Employment of Personnel</u>: Manager shall use its diligent efforts to investigate, hire, pay, supervise and discharge the personnel necessary to be employed by it to properly maintain, operate and lease the Project, including without limitation a property manager or business manager at the Project. Such personnel shall in every instance be deemed agents or employees, as the case may be, of the Project. Owner has no right of supervision or direction of agents or employees of the Project whatsoever. All Owner directives shall be communicated to Manager's senior level management employees. Manager and all personnel of Manager who handle or who are responsible for handling Owner's monies shall be bonded in favor of Owner. Manager shall furnish such surety bond at Manager's sole expense and shall provide Owner Two Million Dollars ($2,000,000.00) per occurrence coverage with a Ten Thousand Dollar ($10,000.00) deductible. All reasonable salaries, wages and other compensation of personnel employed by Manager, including so-called fringe benefits, Worker's Compensation, medical and health insurance and the like, shall be deemed to be reimbursable expenses of Manager. Manager may allow its employees who work at the Project and provide services to the Project after normal business hours, to reside at the Project, with Owner approval, for reduced rents in consideration of their benefit to Owner and the Project.

2.4   Utility and Service Contracts:   Manager shall , at Owner's request as agent for Owner, obtain bids and or proposals for contracts for water, electricity, gas, fuel, oil, telephone, vermin extermination, trash removal, cable television, security protection and other services deemed by Manager to be necessary or advisable for the operation of the Project. Manager is not authorized to execute agreements as mentioned above but not limited to the above. Only the owner will execute all agreements with the exception of the apartment leases. Manager shall  place orders in name of Owner for such equipment, tools, appliances, materials, and supplies as are reasonable and necessary to properly maintain the Project.  Manager may make such contracts and place such orders in Owner's name or in its own name, as Owner's agent.   Owner agrees to pay or reimburse Manager for all expenses and liabilities incurred by reason of this Section.

2.5   Maintenance and Repair of Property:  Manager shall use its diligent efforts to maintain, at Owner's expense, the buildings, appurtenances and grounds of the Project in good condition and repair and in accordance with standards established by Owner in writing from time to time, including interior and exterior cleaning, painting and decorating, plumbing, carpentry and such other normal maintenance and repair work as may be reasonably desirable taking into consideration the amount allocated therefore in the Annual Business Plan (as defined below).  With respect to any expenditure not contemplated by the Annual Business Plan, Manager shall not incur any individual item or repair or replacement in excess of those amounts contemplated by the Annual Business Plan unless authorized in writing by Owner's Representative, excepting, however, that emergency repairs immediately necessary for the preservation and safety of the Project or to avoid the suspension of any service to the Project or danger of injury to persons or damage to property may be made by Manager without the approval of Owner's Representative.   Owner shall not establish standards of maintenance and repair which violate or may violate any laws, rules, restrictions or regulations applicable

to Manager or the Project or which expose Manager to risk of liability to tenants or other persons.  Manager shall not be obligated by this Section to perform any major capital improvements.

2.6     Supervision of Capital Improvements or Major Repairs:  When requested by the Owner or set forth in an Approved Business Plan, Manager, at Owner's expense and in Owner's name or in Manager's name, as agent for Owner, shall supervise the installation and construction of all capital improvements or major repairs to the Project, providing such improvements or repairs are within Manager's expertise. In such events, Manager with Owner's approval, may negotiate contracts with all necessary contractors, subcontractors, materialmen, suppliers, architects, and engineers on behalf of, and in the name of, Owner, and may compromise and settle any dispute or claim arising therefrom on behalf of and in the name of Owner; provided only that the Manager shall act in good faith and in the best interest of the Owner at all times.  Manager will furnish all personnel necessary for proper supervision of the work and may assign personnel located at the Project to such supervisory work (and such assignment shall not reduce or abate any other fees or compensation owed to Manager under this Agreement).

2.7     Insurance:

(a)     At Owner's written request and expense, Manager or, if applicable, the Owner shall use its diligent efforts to obtain and keep in force all forms of insurance required by law or reasonably deemed by Manager and Owner necessary or needed to adequately protect Owner and Manager, including but not limited to Worker's Compensation insurance, Public Liability insurance, Boiler insurance, Fire and Extended Coverage insurance, and Burglary and Theft insurance.  All insurance coverage shall be placed with such companies, in such amounts and with such beneficial interest appearing therein as shall be reasonably acceptable to Owner, and Manager and shall be in conformity with the requirements of any mortgage on the Project.  Owner, on behalf of itself and its insurance carriers hereby waives all claims

The Metropolitan Lofts              July 2011                              8

and causes of action against Manager in respect of damage to the Project caused by casualty (an "Insurable Casualty") insurable (whether insured or not) under the terms of Fire and Extended Coverage Property insurance policies and endorsements obtainable in the State of Florida, unless such casualty is a result of the gross negligence of Manager, its employees, agents, or contractors.  Owner agrees that no insurance carrier of Owner's shall ever have a claim against Manager for an Insurable Casualty to the Project, whether by assignment, subrogation, or otherwise unless such casualty is a result of the Manager's gross negligence..  Owner assumes all risks in connection with the adequacy of any insurance coverage, and waives any claim against Manager for any liability, cost of expense arising out of any uninsured, in part or in full, of any nature whatsoever except gross negligence; provided, however, that Public Liability Insurance shall be maintained in such amounts as Owner and Manager jointly agree.  All general public liability and other liability policies carried by or for Owner shall name Owner and Manager as insureds and said coverage is a condition precedent to Manager's responsibilities hereunder.  Owner shall provide to Manager certificates evidencing such insurance coverage prior to Manager's actually assuming management of the Project. Manager use its diligent efforts to investigate and make a written report to the Owner as to all accidents, claims for damage relating to the ownership, operation and maintenance of the Project, any damage or destruction to the Project and the estimated cost of repair thereof, and shall prepare any and all reports for any insurance company in connection therewith as directed by Owner.  Nothing in this Section 2.7 nor any insurance obtained or applied for by Owner or Manager shall be construed or implying that Owner or Manager is subject to a liability it would not otherwise be subject to.

(b)     Owner and Manager mutually agree for the benefit of each other to look only to the appropriate insurance coverages in effect pursuant to this Agreement in the event any demand, claim, action, damage, loss, liability or expense occurs as a result of injury to person or damage to property, regardless whether any such demand,

claim, action, damage, loss, liability or expense is caused or contributed to, by or results from the negligence of Owner or Manager or their respective subsidiaries, affiliates, employees, directors, officers, agents or independent contractors and regardless whether the injury to person or damage to property occurs in and about the Project or elsewhere as a result of the performance of this Agreement. Except for claims that are covered by the indemnity contained in Paragraph C below, Owner agrees that Owner's insurance shall be primary without right of subrogation against Manager with respect to all claims, actions, damage, loss or liability in or about the Project. Nevertheless, in the event such insurance proceeds are insufficient to satisfy (or such insurance does not cover) the demand, claim, action, loss, liability or expense, Owner agrees, at its expense, to indemnify and hold Manager and its subsidiaries, affiliates, officers, directors, employment, agents or independent contractors harmless to the extent of the excess liability. For purposes of this Section, any deductible amount under any policy of insurance shall not be deemed to be included as part of collectible insurance proceeds.

(c)     Notwithstanding anything contained in this Agreement to the contrary, Manager shall indemnify and hold harmless Owner, and its representative subsidiaries, affiliates, officers, directors, employees, agents or independent contractors, from all demands, claims, actions, loss, liability or expense which is not covered by insurance and which is determined to have resulted from the gross negligence, willful misconduct or breach of this Agreement by Manager in connection with the performance of its duties and obligations under this Agreement.

(d)     In no event shall Manager have any liability to Owner or others for any acts of vandalism, trespass or criminal activity of any kind by tenants or third parties on or with respect to the Project and Owner's insurance shall be primary insurance without right of subrogation against Manager regarding claims arising out of or resulting from acts of vandalism, trespass or criminal activity.

(e)     Owner shall further protect and indemnify Manager against and hold it harmless from all damages, claims, loss cost or expenses, arising out of actual or alleged defects whether latent or patent, relating to the Project, including but not limited to water damage, indoor air quality issues, mold growth, structural defects, or second hand smoke, or any breach or alleged breach of any legal duty or obligation which is by law, or pursuant to this Agreement, the responsibility of Owner.

2.8     Collection of Monies:   Manager shall use its diligent efforts to collect all rents and other charges due from tenants, users of garage spaces (if any), commercial lessees (if any) and concessionaires (if any) in respect of the Project and otherwise due Owner with respect to the Project in the ordinary course of business, provided that Manager does not guarantee the credit worthiness of any tenants, users, lessees, concessionaires or collectibility of accounts receivable from any of the foregoing. Owner authorizes Manager to request, demand, collect, receive and receipt for all such rent and other charges and to institute legal proceedings in the name of Owner, and at Owner's expense, for the collection thereof, and for the dispossession of tenants and other persons from the Project or to cancel or terminate any lease, license or concession agreement for breach or default thereunder, and such expense may include the engaging legal counsel for any such matter. All monies collected by Manager shall be deposited in the separate bank account referred to in Section 4.2 herein Manager shall take no action as to Commercial Tenant leases without the prior written approval of the Owner.

2.9     Manager Disbursements:

(a)     Manager shall, from the funds collected and deposited, cause to be disbursed regularly and punctually (1) Manager's compensation, together with all sales or other taxes (other than income) which Manager is obligated, presently or in the future, to collect and pay to the State of Florida or any other governmental authority, (2) the amounts reimbursable to Manager under this Agreement, (3) the amount of all real

estate taxes and other impositions levied by appropriate authorities which, if not escrowed with any mortgagee, shall be paid upon specific written direction of Owner before interest begins to accrue thereon; and (4) amounts otherwise due and payable as operating expenses of the Project authorized to be incurred under the terms of this Agreement.  After disbursements as herein specified or other costs and expenses incidental to the operation of the Project, including nonrecurring emergency repairs and capital expenditures which shall become due and payable within the succeeding calendar month and for which the cash to make such payments may not be generated by operations during such period, any balance remaining at the end of each calendar month during the term of this Agreement shall be disbursed to the General Partnership or transferred as generally or specifically directed from time to time by Owner's Representative.

(b)     The provisions of this Section 2.9 regarding disbursements by Manager shall not include the payment of debt service related to any mortgages of the Project.  Owner agrees that payments of this nature shall be the responsibility of Owner.

(c)     All costs, expenses, debts and liabilities owed to third persons that are incurred by Manager pursuant to the terms of this Agreement and in the course of managing, leasing and operating the Project shall be the responsibility of Owner and not Manager. Owner agrees to provide sufficient working capital funds, as approved by Owner, to Manager so that all amounts due and owing may be promptly paid by Manager. Manager is not obligated to advance any funds. As of the first day of each month of this Agreement, Manager will project the cash requirements for such month and (if it shall reasonably determine that collections will be insufficient to meet such cash requirements) request the necessary additional funds from the Owner, which funds will be deposited with the Manager in the segregated bank account referred to in Section 4.2 upon 10 days notice.  If at any month end, the bank balance exceeds the

The Metropolitan Lofts              July 2011                                    12

projected cash requirements, such excess shall be returned to the Owner within five days. If at any time there is not sufficient cash in the account with which to promptly pay the bills due and owing, the Manager will request that the necessary additional funds be deposited in an amount sufficient to create an operating reserve pursuant to Section 4.4. Owner will deposit the additional funds requested by the Manager within five (5) days.

(d)     The provisions of this Section 2.9 regarding reimbursements to Manager shall not limit Manager's rights under any other provisions of this Agreement.

2.10   <u>Use and Maintenance of Premises</u>:   Manager agrees that it will not knowingly permit the use of the Project for any purpose which might void any policy of insurance held by Owner or which might render any loss thereunder uncollectible, or which would be in violation of any government restriction or any covenant or restriction of any lease of the Project.   Manager shall use its good faith efforts to secure substantial compliance by the tenants with the terms and conditions of their respective leases. All costs of correcting or complying with, and all fines payable in connection with, all orders or violations affecting the Project placed thereon by any governmental authority or Board of Fire Underwriters or other similar body shall be at the cost and expense of Owner.

2.11   <u>Annual Business Plan</u>:

(a)     On or before November 1 of each calendar year during the term of this Agreement, Manager shall prepare and submit to Owner for Owner's approval, an Annual Business Plan, in format approved by Owner, (herein so called) for the Project for the promotion, leasing, operations, repair and maintenance of the Project for each calendar year during which this Agreement is in effect. The Annual Business Plan shall include a detailed budget of projected income and expenses for the Project for such calendar year (the "Operating Budget") and a detailed budget of projected capital improvements for the Project for such calendar year (the "Capital Budget").

The Metropolitan Lofts              July 2011                                    13

(b)     Manager shall meet with Owner to discuss the proposed Annual Business Plan and Owner shall approve the proposed Annual Business Plan within 20 days. To be effective, any notice which disapproves a proposed Annual Business Plan must contain specific objections in reasonable detail to individual line items. If Owner fails to provide an effective notice disapproving a proposed Annual Business Plan within such 20 day period, the proposed Annual Business Plan shall be deemed to be approved. Owner acknowledges that the Operating Budget is intended only to be a reasonable estimate of the Project's income and expenses for the ensuing calendar year. Manager shall not be deemed to have made any guarantee, warranty or representation whatsoever in connection with the Operating Budget.

(c)     Manager may revise the Operating Budget from time to time, as necessary, to reflect any unpredicted significant changes, variables or events or to include significant additional, unanticipated items of revenue and expense. Any such revision shall be submitted to Owner for approval, which approval shall not be unreasonably withheld, delayed or conditioned.

(d)     Manager agrees to use diligence and to employ all reasonable efforts to ensure that the actual costs of maintaining and operating the Project shall not exceed the Operating Budget which is a part of the approved Annual Business Plan either in total or in any one accounting category. Any expense causing or likely to cause a variance of greater than ten percent (10%) or $2,000, whichever is greater, in any one accounting category for the current month cumulative year-to-date total shall be promptly explained to Owner by Manager in the next operating statement submitted by Manager to Owner. During the calendar year Manager shall inform Owner of any major increases or decreases in costs, expenses, and income that were not reflected in the Annual Business Plan.

2.12     Records, Reporting: Manager shall maintain at the regular business office of Manager or at such other address as Manager shall advise Owner in writing,

separate Project books and journals and orderly files, containing rental records, insurance policies, leases, correspondence, receipts, bills and vouchers, and all other documents and papers pertaining directly to the Project or the operation thereof. All corporate statements, receipts, invoices, checks, leases, contracts, worksheets, financial statements, books and records, and all other instruments and documents relating to or arising from the operation or management of the Project shall be and remain the property of Owner;( copy of all checks in and out bound and original invoices to remain on property) provided, however, Manager shall have the right to copy all such matters, at Owner's sole cost and expense, during the term of this Agreement, and and for a reasonable time thereafter not to exceed three years. All on-site records, including leases, rent rolls, and other related documents shall remain at the Project as property of Owner.

   2.13   Financial Reports:

   (a)   Monthly Reports:  On or before the fifteenth day of each month during the term of this Agreement, Manager shall deliver to Owner's Representative monthly financial reports in a format as directed by Owner. Lincoln shall also prepare in its format a  statement of cash flow, Project Operating Report for both current month and year-to-date, Actual to Budget Report for the current year, Balance Sheet, General Ledger, Check Summary Report, Aged Payable Listing, Aged Receivables Report, Security Deposit Report, Rent Roll, Bank Statement and Bank Reconciliation for the Project (on a modified accrual basis) for the preceding calendar month. Manager shall also include an Executive Summary, a variance report regarding the variances on the P&L statement, as well as a report on the current status' of the market in which the Project is located. All notices from any mortgagee claiming any default in any mortgage on the Project, and any other notice from any mortgagee not of a routine nature, shall be promptly delivered by Manager to Owner's Representative.

(b)    Annual Report: Within 30 days after the end of each calendar year of the Project, Manager shall deliver to Owner's Representative a statement of cash flow showing the results of operations for the calendar year or portion thereof during which the provisions of this Agreement were in effect.

(c)    Returns Required by Law: Manager shall execute and file punctually when due all forms, reports and returns required by law relating to the employment of personnel.

2.14  Compliance with Legal Requirements:  Owner acknowledges that Manager does not hold itself out to be an expert or consultant with respect to, or represent that, the Project currently complies with applicable ordinances, regulations, rules, statutes, or laws of governmental entities having jurisdiction over the Project or the requirements of the Board of Fire Underwriters or other similar bodies (collectively, "Governmental Requirements").  Manager shall take such action as may be reasonably necessary to comply with any Governmental Requirements applicable to Manager, including the collection and payment of all sales and other taxes (other than income taxes) which may be assessed or charged by the State of Florida or any governmental entities in connection with Manager's Compensation.  If Manager discovers the Project does not comply with any Governmental Requirements, Manager shall take such action as may be reasonably necessary to bring the Project into compliance with such Governmental Requirements, subject to the limitation contained in Section 2.5 of this Agreement regarding the making of alterations and repairs.  Manager, however, shall not take any such action as long as Owner is contesting or has affirmed its intention to contest and promptly institute proceedings contesting any such order or requirement. If, however, failure to comply promptly with any such order or requirement would or might expose Manager to civil or criminal liability, Manager shall have the right, but not the obligation, to cause the same to be complied with and Owner agrees to indemnify and hold Manager harmless for taking such actions and to promptly reimburse Manager

for expenses incurred thereby.  Manager shall promptly, and in no event later than 72 hours from the time of receipt, notify Owner's Representative in writing of all such orders or notices.  The Manager also shall not be liable for any effort or judgement or for any mistake of fact of law, or for anything which it may do or refrain from doing hereinafter, except in cases of willful misconduct or gross negligence of Manager.

ARTICLE III

Manager's Compensation, Term

3.1   Management Fee:  Commencing on the date hereof, Owner shall pay Manager a monthly management fee equal to three percent (3%) of Gross Collections (as defined below) for such month, or a minimum fee of $3,500 per month, but not to exceed $5000, payable monthly in arrears.  The term "Gross Collections" shall mean all amounts actually collected as rents or other charges for use and occupancy of apartment units and from users of garage spaces (if any), leases of other non-dwelling facilities in the Project and concessionaires (if any) in respect of the Project, including furniture rental, parking fees, forfeited security deposits, application fees, late charges, income from coin operated machines, proceeds from rental interruption insurance, and other miscellaneous income collected at the Project; but shall exclude all other receipts, including but not limited to, income derived from interest on investments or otherwise, proceeds of claims on account of insurance policies (other than rental interruptions insurance), abatement of taxes, and awards arising out of eminent domain proceedings, discounts and dividends on insurance policies. Manager shall agree to abate the monthly management fee for the initial month of this Agreement. Manager shall earn its first monthly management fee the second month of managing the Project.

3.2   Term:  This Agreement shall commence as of _____, and shall thereafter continue for a period of one year from said commencement date, unless otherwise terminated as provided herein. If neither party gives written notice to the other at least thirty (30) days prior to the expiration date hereof that this Agreement

is to terminate, then this Agreement shall automatically continue thereafter on a month-to-month basis until terminated by either party by written notice given at least 30 days in advance of such termination. If all or any substantial portion of the Project is damaged or destroyed or in the event of condemnation of a substantial portion of the Project, Owner may terminate this Agreement by 30 days written notice to Manager. Notwithstanding any other provision on this Agreement to the contrary, if a receiver, liquidator or trustee of either party shall be appointed by court order, or if a petition to reorganize shall be filed against either party under any bankruptcy, reorganization or insolvency laws and such petition is not dismissed within 120 days, or if any assignment for the benefit of creditors is made, then either party may forthwith terminate this Agreement upon 30 days written notice to the other party. Upon any termination of this Agreement, Manager shall be entitled to receive all compensation and reimbursements, if any, due to Manager through the date of termination. Either party may terminate this agreement at any time with or without cause by providing thirty (30) days written notice to the other.

ARTICLE IV

Procedures for Handling Receipts and Operating Capital

4.1     Security Deposits:     A separate non-interest bearing account shall be opened by Manager for tenant security deposits. Owner agrees to indemnify and hold harmless Manager, and Manager's representatives, officers, directors and employees for any loss or liability with respect to any use by Owner of the tenant security deposits that is inconsistent with the terms of the lease and applicable laws.

4.2     Separation of Owner's Monies:     Manager shall establish and maintain, in a bank of Owner's choice whose deposits are insured by the Federal Deposit Insurance Corporation, and a manner to indicate the custodial nature thereof, a single separate bank account for the deposit of all monies of Owner.

4.3     Depository Accounts:  Owner and Manager agree that Manager shall have no liability for loss of funds of Owner contained in the bank accounts for the Project maintained by Manager pursuant to this Agreement due to insolvency of the bank or financial institution in which its accounts are kept, whether or not the amounts in such accounts exceed the maximum amount federal or other deposit insurance applicable with respect to the financial institution in question.

4.4     Working Capital:  In addition to the funds derived from the operation of the Project, Owner shall furnish and maintain in the operating accounts of the Project such other funds as may be necessary to discharge financial commitments required to efficiently operate the Project and to meet all payrolls and satisfy, before delinquency, and to discharge all accounts payable.   Manager shall have no responsibility or obligation with respect to the furnishing of any such funds.   Nevertheless, Manager shall have the right, but not the obligation, to advance funds or contribute property on behalf of Owner to satisfy obligations of Owner in connection with this Agreement and the Project.   Manager shall keep appropriate records to document all reimbursable expenses paid by Manager, which records shall be made available for inspection by Owner or its agents on request.   Owner agrees to reimburse Manager with interest upon demand for money paid or property contributed in connection with the Project and this Agreement.

4.5     Authorized Signatures:   Any persons from time to time designated by Manager shall be authorized signatories on all bank accounts established by Manager pursuant to this Agreement and shall have authority to make disbursements from such accounts.  Funds may be withdrawn from all bank accounts established by Manager, in accordance with this Article IV, only upon the signature of an individual who has been granted that authority by Manager and funds may not be withdrawn from such accounts by Owner unless Agent is in default hereunder.

The Metropolitan Lofts                July 2011                                        19

ARTICLE V

Miscellaneous

5.1 Assignment: Upon thirty (30) days written notification, Owner may assign its rights and obligations to any successor in title to the Project and upon such assignment shall be relieved of all liability accruing after the effective date of such assignment.

5.2 Notices: All notices required or permitted by this Agreement shall be in writing and shall be sent by registered or certified mail, addressed in the case of Owner to Luke Leonaitis MJL, Ltd 421 W. Church St. Suite 100 Jacksonville, Fl 32202 and in the case of Manager to Chris Burns, Lincoln Property Company, 6340 Sugarloaf Parkway, Suite 350, Atlanta, GA 30097, or to such other address as shall, from time to time, have been designated by written notice by either party given to the other party as herein provided.

5.3 Entire Agreement: This Agreement shall constitute the entire agreement between the parties hereto and no modification thereof shall be effective unless in writing executed by the parties hereto.

5.4 No Partnership: Nothing contained in this Agreement shall constitute or be construed to be or create a partnership or joint venture between the Owner, its successors or assigns, on the one part, and Manager, its successors and assigns, on the other part.

5.5 No Third Party Beneficiary: Neither this Agreement nor any part hereof nor any service relationship shall inure to the benefit of any third party, to any trustee in bankruptcy, to any assignee for the benefit of creditors, to any receiver by reason of insolvency, to any other fiduciary or officer representing a bankrupt or insolvent estate of either party, or to the creditors or claimants of such an estate. Without limiting the generality of the foregoing sentence, it is specifically understood and agreed that insolvency or bankruptcy of either party hereto shall, at the option of the other party,

void all rights of such insolvent or bankrupt party hereunder (or so many of such rights as the other party shall elect to void).

5.6    Severability:  If any one or more of the provisions of this Agreement, or the applicability of any such provision to a specific situation shall be held invalid or unenforceable, such provision should be modified to the minimum extent necessary to make it or its application valid and enforceable, and the validity and enforceability of all other provisions of this Agreement and all other applications of such provisions shall not be affected thereby.

5.7    Captions, Plural Terms:  Unless the context clearly requires otherwise, the singular number herein shall include the plural, the plural number shall include the singular and any gender shall include all genders.  Titles and captions herein shall not affect the construction of this Agreement.

5.8    Attorneys' Fees:  Should either party employ an attorney to enforce any of the provisions of this Agreement, or to recover damages for breach of this Agreement, the non-prevailing party in any action agrees to pay to the prevailing party all reasonable costs, damages and expenses, including reasonable attorneys' fees, expended or incurred by the prevailing party in connection therewith.

5.9    Signs:  Manager shall have the right to place signs on the Project in accordance with applicable Governmental Requirements stating that Manager is the manager and leasing agent for the Project.

5.10   Survival of Indemnities:  The indemnification obligations of the parties to this Agreement shall survive the termination of this Agreement to the extent of any claim or cause of action based on an event occurring prior to the date of termination

5.11   Terrorism and Money Laundering:   Owner and Manager mutually represent and warrant to each other as follows:

a)    They are not now nor will they be at any time following the execution of this Agreement a Person with whom a U.S. Person is prohibited from transacting

business of the type contemplated by this Agreement, whether such prohibition arises under U.S. law, regulation, executive orders and lists published by the Office of Foreign Asset Control ("OFAC") (including those executive orders and lists published by OFAC with respect to Specially Designated Nationals and Blocked Persons) or otherwise (such persons being referred to in this Agreement as "Prohibited Persons"); and

b)   They have made reasonable inquiry and taken such other steps, consistent with best industry practices (including conducting background searches and checking published lists of Prohibited Persons) and in any event as required by applicable law, to ensure that no Person who is an employee of their respective organization or who owns an interest in their respective organization is now, or will be at any time following the execution of the Agreement, a Prohibited Person.

5.12    Resident Data:  Owner hereby recognizes that Manager may utilize the services of "Resident Data"  Resident Data" will charge and Owner hereby agrees to pay for such services as needed by Manager on behalf of Owner. Owner expressly consents and hereby authorizes Manager to use "Resident Data" in performing its duties as Manager hereunder.

5.13    Governing Law, Venue:  This Agreement shall be construed under and in accordance with the laws of the State of Florida and is fully performable in Duval County, Florida.

5.14    Competitive Projects:  Manager may, individually or with others, engage or possess an interest in any other project or venture of every nature and description, including but not limited to, the ownership, financing, leasing, operation, management, brokerage and sale of real estate projects including apartment projects other than the Project, whether or not such other venture or projects are competitive with the Project

The Metropolitan Lofts              July 2011                              22

and Owner shall not have any claim as to such project or venture or to the income or profits derived therefrom. Manager agrees to provide written notification to Owner upon accepting any assignment within a five-mile radius of the Project.

5.15   Interest: Any amount payable to Manager under this Agreement which is not paid when due shall accrue interest at the lesser of 18% per annum or the maximum lawful rate.

5.16   Set Off: Without prejudice to Manager's right to terminate this Agreement in accordance with the terms of this Agreement, Manager may at any time and without notice to Owner, set off or transfer any sums held by Manager for or on behalf of Owner in the accounts maintained pursuant to this Agreement in or towards satisfaction of any of Owner's liabilities to Manager in respect of any sums due to Manager under this Agreement.

5.17   Counterparts:   This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original.

5.18   Internal Audit: The Project shall be audited annually by Lincoln's Internal Audit Group and a written report of findings prepared and presented to Owner at no cost to Owner.

5.19   Software Costs: Owner agrees to pay to Manager the initial one-time licensing fees associated with the Yardi system as well as quarterly hosting and development fees during the term of this agreement. The licensing fee for Yardi for the Project shall be $1,250.00. Quarterly hosting and development fees shall be $500 per quarter during the initial term of this agreement.

ARTICLE VI

Environmental Matters

6.1   Environmental Representations and Indemnification:   Owner hereby warrants and represents to Manager that to Owner's actual knowledge, the Project has not previously been nor is presently being used to treat, deposit, store, dispose of, or

place any hazardous substance on the Project, or any part thereof.  In the event a release of any hazardous substance on the Project occurs, or is threatened, prior to the termination of this Agreement, which release or threatened release, in Manager's sole opinion, may subject Manager to liability or claims under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C.A. Section 9607; under any law of the State of Florida, or any ordinance of the city of Jacksonville, Florida; or any other Governmental Requirement (collectively, "Environmental Laws"), Manager shall be entitled to immediately terminate this Agreement.  Furthermore, Owner hereby agrees to indemnify and hold Manager harmless from any claims, liabilities, causes of Action, and other expenses which may be incurred by Manager, including attorneys' fees, due to any violation of the Environmental Laws unless the violation of the Environmental Laws is directly attributable to a breach by Manager of its duties and obligations under this Agreement.

ARTICLE VII

Special Conditions

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed by their duly authorized representatives.

"OWNER"

**MJL, Ltd** a Florida Limited Partnership

By: LW Jax, Inc.,
a Delaware corporation, its general partner

By:_____
Name:  Liliane Welty
Title:    President

Date_____


"MANAGER"

**LINCOLN APARTMENT MANAGEMENT** a
LIMITED PARTNERSHIP
a Delaware limited partnership

By: Lincoln BP Management, Inc.
 a Texas corporation, its general partner

By:_____
Name: Chris Burns
Title: Vice President

Date_____